Edwin M. Clark, Jr., and Kate B. Clark v. Commissioner.
Clark v. Commissioner
Docket No. 60936.
United States Tax Court
T.C. Memo 1958-10; 1958 Tax Ct. Memo LEXIS 223; 17 T.C.M. (CCH) 39; T.C.M. (RIA) 58010; January 28, 1958
*223 Petitioner acquired from a corporation, in 1949 and 1951, the ownership of two small-loan "brokerage" offices, including one of which he had been the office manager. In connection with such transfers, he executed and delivered to the corporation two long-term installment promissory notes, together with agreements written on the backs thereof which provided in part that it was mutually agreed between the "seller" and "buyer" that such notes constituted payment for the purchase price of the businesses of said offices, including all rights then vested in the "seller"; and that the "buyer" might sell his "equity" at any time, if the "seller" had no reasonable objection to such sale. Thereafter, petitioner operated the businesses, as sole proprietor, at the location and under the same trade name which the seller had been using. The seller, in accordance with supplemental oral arrangements, thereafter acted for the petitioner as a finder of loanable funds, and as a guarantor of borrowers' loans. Petitioner contends that the installment payments made by him during the taxable years on the above-mentioned promissory notes were for services performed for him by the corporation, and were not *224 payments on the purchase prices of the properties; and that such payments constitute deductible business expenses, for income tax purposes. Held, that the character of the transactions and the purpose of the promissory notes depend principally upon the intent of the parties, at the time when the agreements and notes were executed and delivered; that such intent must be determined from an examination and the weighing of all relevant facts and surrounding circumstances; and that the mutual written agreements of the parties, that the notes were delivered as the purchase price of the going businesses, are to be given greater weight in determining such intent than the contrary contentions and conclusions presented by the petitioner at the trial several years later, without substantiation by any documentary evidence of record. Held, further, that, since the petitioner, under the terms of the agreements, acquired not only possession and use of properties but also a transferable "equity" therein, the payments under such agreements are to be regarded as deferred installments on the purchase price of the properties. Held, further, that such installment payments made by petitioner during *225 the taxable years involved do not qualify as deductible business expenses under section 23(a)(1)(A) of the 1939 Code. James L. Davis, Jr., Esq., First Federal Savings Building, Jackson, Miss., for the petitioners. Homer F. Benson, Esq., for the respondent. PIERCE
Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined deficiencies in petitioners' income tax (and self-employment tax) for the calendar years 1951, 1952 and 1953 in the amounts of $385.74, $642.82 and $798, respectively. Several of the adjustments set forth in the notice of deficiency were not challenged by petitioners. The sole issue for decision is whether certain installment payments made by petitioner Edwin M. Clark, Jr., during the taxable years involved, pursuant to the terms of two promissory notes which he delivered to Tower Underwriters, Inc. in 1949 and 1951 qualify as deductible business expenses, incurred during the taxable years in carrying on a small-loan "brokerage" business; or whether these payments represent nondeductible installments on the purchase price of two such brokerage businesses, which petitioner acquired from said corporation at the time of delivery *226 of said notes. Findings of Fact The petitioners, Edwin M. Clark, Jr. and Kate B. Clark, are husband and wife residing in Jackson, Mississippi. For each of the taxable years involved, they filed a joint income tax return with the collector or district director of internal revenue at Jackson, Mississippi. Prior to June 1, 1949, petitioner Edwin M. Clark, Jr. (herein called the "petitioner") was employed by Tower Underwriters, Inc., a Mississippi corporation, as office manager of one of about 15 so-called small-loan "brokerage" offices which said corporation operated in the State of Mississippi. Two of these brokerage offices were located in the city of Jackson. The one that petitioner managed, which was the largest of all the offices, was operated under the name of Tower Loan Brokers, and was located on South State Street in Jackson., and the other Jackson office was operated under the name of Dollar Brokers, and was located on South President Street. Tower Underwriters had engaged in such business since the year 1940. Its organizer, principal stockholder, president and executive manager was Wyatt Robinson. Petitioner had been employed by the corporation since the end of the year *227 1947; and, in addition to being manager of the State Street office, was also a member of the corporation's board of directors. Small-loan "brokerage" offices, such as those here involved, are more or less unique to the State of Mississippi. [1] That state, during the years involved, had no small loan law; and various persons who desired to engage in the business of making small loans were unwilling to deal directly with borrowers, because they considered that the legal rates of interest permitted to be charged in Mississippi on small loans were too low to justify the risks involved; because the penalties provided by the Mississippi usury statutes [2] for charging higher rates of interest were severe; and also because both the state and many of the municipalities thereof imposed privilege taxes of substantial amount on persons who engaged in the business of loaning money. Thus, with a view to circumventing and avoiding the application of such usury statutes and privilege taxes, certain lenders (which were often corporations organized in the bordering State of Louisiana, that had no Mississippi office) made arrangements with small-loan "brokers" operating within Mississippi, who purported *228 to act as agents for borrowers in finding lenders, and who charged the borrowers "brokerage" fees for services in arranging the loans. Such arrangements enabled the lenders to operate outside the State of Mississippi in accepting offers for loans forwarded to them by the local "brokers," to fix their rates of interest without being restricted by the usury laws and privilege taxes applicable in Mississippi, and also to eliminate the expense of dealing directly with the borrowers. The method of operation which Tower Underwriters employed in operating its several loan brokerage offices was substantially as follows: Assuming, for example, that a potential borrower wished to obtain a loan of $100 for a period of from 1 *229 to 6 months, and that he had insufficient credit to obtain such loan from a local bank or loan company, he might go to one of the loan brokerage offices of Tower Underwriters. The manager of such office acting as the "broker," would if satisfied with the risk involved, agree with the borrower to act as his agent in finding a lender, in consideration of the borrower's agreement to pay a brokerage fee of about $20 for such service. The "broker" would thereupon prepare and have the borrower execute a contract covering the arrangement, and also promissory notes covering the principal amount of the loan, the amount of the interest to maturity as charged by the lender, and the amount of the "brokerage" fee. In some cases, all of these items would be included in a single note, made payable to the lender; and in other cases, all or part of the "brokerage" fee would be included in a separate note made payable to the broker. Both the contract and notes were prepared on printed forms which provided for payment of the obligation by the borrower in monthly installments; which also provided for the posting of collateral or other security by the borrower that might be increased at any time upon demand *230 of the lender, and which further provided for acceleration of the maturity of the note and the payment of additional amounts as "attorney's fees," in the event of delay or default by the borrower in making payment of any installment. After said instruments had been executed, the broker would endorse the principal note, as primary guarantor; and would then forward the same to the lender (usually a Louisiana lending corporation) for its approval and acceptance. Such lender, in order to obtain additional protection for itself, usually required the broker, either to obtain the endorsement or guarantee of a second party, or to make a deposit in an amount equal to an agreed percentage of each loan, as a reserve against potential losses. The nature of such protective arrangements varied, depending on the particular lender, the extent of the lender's confidence in the broker, and the risks and terms of the particular loan involved. If the lender corporation accepted the borrower's promissory note, it would forward the amount of the $100 loan to the broker, for delivery to the borrower; and it also would forward to the broker (either at the time the note was accepted or at the time the *231 note was fully paid, depending upon the particular arrangements) any portion of the brokerage fee that was included in the principal note. Subsequent collection of the loan would usually be handled by the broker, but it might be handled directly by the lender. The handling of loans under such arrangement involved considerable risk to the lender, to the broker, and to any secondary endorser; but, if the broker employed good judgment in his selection of borrowers, losses would be held to a minimum; and the arrangement could be very profitable to all of said parties. The short period of the loans enable the lender's funds to be reused two or three times per year; and the provisions of the notes pertaining to the acceleration of maturity in the event of delay or default by the borrower in paying any installment, might result in refinancing arrangements and a compounding of the 20 per cent brokerage fee. An essential feature of the arrangement was that the lender, the broker and any secondary guarantor had to be legally separate from each other, if application of the Mississippi usury statutes and privilege taxes was to be avoided. Thus, the broker contracted with the borrower to act *232 as his agent, and took the position that he was not engaged in the business of loaning money, but only in rendering personal services. The secondary guarantor took the position that it likewise was not a lender of money, but merely a guarantor of paper handled by other parties. And the lender's position was that it was not subject to Mississippi law, because its acceptance of borrower's promissory notes was effected outside the borders of said state. Tower Underwriters, Inc., in operating its several brokerage offices during the first months of 1949, suffered from a shortage of operating capital; its balance sheet disclosed an unsatisfactory financial condition; and it was unable to arrange with lenders for sufficient loanable funds to meet the requests of borrowers. Also, one of its Louisiana lenders indicated an intention to increase its rate of interest on loans, which would adversely affect the corporation's business. Wyatt Robinson, as president of Tower Underwriters, was greatly concerned about this situation; and he had frequent discussions with petitioner, as to ways and means for procuring additional loanable funds. The plan which Robinson finally adopted to meet the situation, *233 and which he explained both to petitioner and to the board of directors of his corporation, was as follows: Beginning on about June 1, 1949, and continuing until about 1951, Tower Underwriters sold all of its several brokerage offices to the managers thereof (including petitioner), for agreed amounts evidenced by long-term promissory notes that were made payable in monthly installments, without current interest; and, thereafter, Tower Underwriters acted solely in the capacities of being an independent finder of loanable funds, and a secondary guarantor for borrower's notes originating in such brokerage offices. The forms of the promissory notes and agreements which the several office managers executed in connection with their purchase of such offices, were all similar to those executed by petitioner, which are hereinafter set forth. From such sales of its brokerage offices, Tower Underwriters received in 1949 approximately $120,000 face value of 10-year installment promissory notes of the purchasing office managers; and by 1951 the face amount of promissory notes which it received from such sales of its brokerage offices totaled nearly one-quarter million dollars. In 1949 it entered *234 in its books of account, the $120,000 of office managers' notes then received, as long-term accounts receivable; and, on its 1949 income tax return, it reported the gains from the sales of its brokerage offices as long-term capital gains. Through such treatment of the office managers' notes, it improved its balance sheet, so as to show a favorable rather than a distressed financial condition; and it used such balance sheet and a prospectus which it prepared, to obtain approximately $100,000 of lendable funds for use by the brokerage offices which it had sold. All of this procedure was discussed and explained to petitioner by Robinson. Shortly thereafter, Robinson, acting on behalf of Tower Underwriters under a plan which petitioner later learned about through entries in the corporation's records, organized several lending corporations under the laws of Louisiana; and it transferred the office managers' promissory notes to these new lending corporations, in exchange for their shares of stock. One of these new Louisiana lending corporations was Consumers Credit Corporation of Bogalusa, Louisiana, which thereafter served as the principal lender for petitioner, in his continued operation *235 of the South State Street office, as owner thereof. The installment promissory note and the agreement typewritten on the back thereof, which petitioner executed in connection with his purchase from Tower Underwriters of its South State Street brokerage office that was operated under the name of Tower Loan Brokers, were as follows: "INSTALLMENT NOTE $18,000.00 HATTIESBURG, MISS., June 1, 1949 "For Value Received, the Undersigned (Promises) To Pay To The Order Of TOWER UNDERWRITERS, INC. At its office in the City of Hattiesburg, Mississippi the sum of Eighteen Thousand Dollars ($18,000.00 payable in 120 consecutive monthly installments of * ONE HUNDRED FIFTY * ($150.00) each, beginning July 1, 1949, and one final installment of Dollars ( $ ) payable on 19 , with interest on any overdue installment at six per cent per annum. "In the event of default in the payment of any of said installment payments above described, the entire balance of the principal of this note then outstanding and unpaid shall, at the election of payee or the holder hereof, without demand or notice, become and shall be due and payable at once. If this note be not paid at maturity, whether by acceleration *236 or otherwise, and it be placed in the hands of an attorney for collection, the parties hereto agree to pay twenty per cent (20%) of the amount then due hereon, as attorney's fees, but the minimum fee shall be $15.00 in any case. "All parties hereto, whether as makers, endorsers, guarantors, or in any other capacity, hereby waive presentment for payment, demand, protest, and notice of dishonor. [Reverse side] "It is mutually agreed between the SELLER AND BUYER as follows "1. This note constitutes the full purchase price for the brokerage business now being operated as TOWER LOAN BROKERS, in Jackson, Miss., including all rights now vested in SELLER. "2. Effective date of transfer is June 1, 1949; on and after that date seller shall bear no further expense incident to the office sold. The buyer shall comply with the rates, rules and regulations of the lender as to the business said lender accepts from the buyer's customers. The Buyer shall carry with the lender a reserve of 1% on all gross notes handled by the lender. The Seller, however, shall continue as a secondary guarantor. "3. As such GUARANTOR the seller shall have the right to take over the business herein conveyed *237 PROVIDED the buyer ceases to function as a broker or endangers the seller's equity as a Guarantor; in which event all previous payments on this note shall be declared rental and any balance remaining unpaid shall be cancelled. The Buyer may sell his equity at any time, provided the Seller has no reasonable objection to the sale. "TOWER UNDERWRITERS, INC. (SELLER) /s/ BY Wyatt Robinson President BUYER Edwin M. Clark, Jr." Subsequently, under date of August 1, 1951, petitioner also purchased from Tower Underwriters, its South President Street brokerage office in Jackson that was operated under the name of Dollar Brokers; and, in connection therewith, he executed another installment promissory note and written agreement. Said promissory note was identical in form with that above set forth, except that the principal amount thereof was $2,475, payable in 99 consecutive monthly installments of $25 each, beginning September 1, 1951. The agreement typewritten on the back of this note, read: "This note is executed by E. M. Clark, Jr., in consideration of the balance due Tower Underwriters, Inc., for the business known as Dollar Brokers in Jackson, Miss. "The terms, and condition, *238 governing the purchase of Tower Loan Brokers in Jackson by Clark, likewise govern the purchase of Dollar Brokers and the payment of this note." "This being mutually understood by all parties." Petitioner, after so purchasing the South State Street brokerage office and becoming the sole owner thereof, continued to operate it in substantially the same manner, at the same location, and under the same name of Tower Loan Brokers, which the selling corporation had employed for several years. After his similar purchase from Tower Underwriters of the second brokerage office on South President Street, he closed such office and consolidated its equipment and accounts with those of the South State Street office. He did not acquire title to any of the furniture, fixtures and physical equipment of either office; but, although such title remained in Tower Underwriters, he continued to use such furniture and equipment with said corporation's consent. At or about the time of petitioner's acquisition of the State Street brokerage office, he and Wyatt Robinson, the president of Tower Underwriters, had certain oral agreements and understandings that were not approved by said corporation's board *239 of directors, but which were thereafter observed. Petitioner was "assured" by Robinson "that there would be a line of credit [or lendable funds] available to make continuity of business operations," which line of credit was "to be built up to approximately $100,000"; that petitioner would not be required to deposit any reserve fund with Tower Underwriters, other than the one per cent on all gross notes of borrowers, as provided for in the written agreement on the back of petitioner's purchase note; that such reserve would gradually be built up, so that at the expiration of his purchase contract, no further reserve deposits would be required; and that Tower Underwriters would, during the period that petitioner was making the installment payments on his purchase notes, act as secondary guarantor for petitioner on borrowers' notes, "without consideration and without charge," other than as provided in the instrument. Petitioner further agreed with Robinson that he would, without charge or fee, endorse and handle the collection of approximately $70,000 outstanding borrowers' notes that had theretofore been placed with lenders through the South State Street office, and in respect of which *240 Tower Underwriters had already collected the brokerage fees. It also was arranged that, in respect of new borrowers' loans on which Tower Underwriters was to be petitioner's secondary guarantor, petitioner would not, in most cases, be entitled to his brokerage fees until after such loans had been fully repaid. In connection with petitioner's purchase of the South President Street office, he and Robinson agreed that an additional "line of credit" of approximately $30,000 would be made available to him; and that most of this would be obtained through petitioner's endorsement and collection, without charge, of approximately $20,000 outstanding borrowers' loans, and through the proceeds of such collections being made available to petitioner for use in arranging other loans. Also, in connection with the transfer of this second office, petitioner did acquire ownership of certain defaulted borrowers' accounts, which were of some value; and he also acquired certain "customers" of the office, who continued to deal with him. Petitioner continued to operate the South State Street brokerage office, as sole owner and under the name of Tower Loan Brokers, during all the taxable years here involved; *241 and he was still so operating it at the time of the trial herein. Also, during each of said years, he made payment of the installments provided for in his two above-mentioned promissory notes, although said promissory notes had, as before stated, been transferred by Tower Underwriters to Consumers Credit Corporation of Bogalusa, Louisiana. Wyatt Robinson died on some unidentified date, after purchase and sale of the offices had been completed. Beginning in August 1951, petitioner increased the amounts of the reserves which he deposited with Tower Underwriters, from one per cent on all gross notes handled by the lender, as provided for in the written agreements executed in connection with his acquisition of the brokerage offices - to two per cent of such borrowers' notes. Also, in all years involved, he paid certain guarantor's fees which he deducted on his returns apparently in respect of increased volume of borrowers' loans not covered by the original agreements. The net profits of Tower Underwriters from its operation of the South State Street brokerage office, for its 3 fiscal years immediately preceding its sale of that office to petitioner, were (exclusive of home office expenses *242 of said corporation): Fiscal year ended June 30, 1947
$2,199.51
Fiscal year ended June 30, 1948
3,220.15
Fiscal period to June 1, 1949
4,639.44
The net profits derived by petitioner from his operation of said office as sole owner, for the taxable years here involved, were (as reported on his income tax returns, after adjustments made by respondent which are not disputed): Net profit after
Taxable year
adjustments
1951
$ 3,918.75
1952
10,708.22
1953
17,292.06
In his income tax returns for the taxable years involved, petitioner deducted as business expenses, designated as "franchise fees," the following amounts of installment payments made on the two promissory notes which he had delivered to Tower Underwriters in 1949 and 1951 in connection with his acquisition of the two brokerage offices above mentioned: Deduction
claimed as
Year
"franchise fees"
1951
$1,925.50
1952
2,100.00
1953
2,100.00 Respondent, in his notice of deficiency, denied all of these claimed deductions. All of said installment payments on petitioner's above-mentioned promissory notes were nondeductible capital expenditures, representing *243 deferred payments on petitioner's cost of purchasing in 1949 and 1951, respectively, the going brokerage office businesses operated under the names of Tower Loan Brokers and Dollar Brokers. Opinion The dispute here is: Whether (as contended by petitioner) amounts which he paid during the taxable years involved, as monthly installment payments on the two promissory notes which he delivered to Tower Underwriters, Inc. in 1949 and 1951, qualify as deductible business expenses [3] incurred in his operations as a small-loan "broker"; or whether (as contended by respondent) such amounts represent nondeductible deferred payments on the purchase prices of two "brokerage" offices with their going businesses, which petitioner acquired from said corporation at the times when said promissory notes were executed and delivered. Petitioner's position is that said payments were made by him for services rendered by Towr Underwriters in the taxable years, in finding "lenders" for his "brokerage" business, in acting as secondary "guarantor" on borrowers' loans arranged by him, and in providing guidance and supervision for his business operations. *244 The solution of such controversy must turn, in our opinion, principally upon the intent of the parties, at the time of the execution and delivery of said notes; and such intent must be gathered from an examination and weighing of all the relevant facts and surrounding circumstances. It is to be observed, at the outset, that the plan for the transfer by Tower Underwriters of its several brokerage offices to the managers thereof, and for the acquisition by it of the promissory notes of such managers, originated with said corporation acting through its president Wyatt Robinson, and not with the managers. Prior to June 1, 1949, said corporation was, according to statements made by petitioner in his testimony and on brief, operating about 15 brokerage offices on a "shoe-string" financial basis; one of its principal corporate "lenders" had indicated an intention to increase the interest rates on loans to borrowers; and the corporation was "facing bankruptcy" for lack of sufficient sources of low-interest bearing lendable funds. In this situation, as further stated by petitioner on brief, "Robinson's ingenious mind conceived of a scheme whereby his Tower Underwriters, Inc. would no longer *245 appear as a shoestring corporation, but would have a tremendous surplus created by an increment in assets by virtue of certain notes," which it would acquire in the manner hereinafter described from the managers of its several brokerage offices. The substance of such scheme, which it adopted after frequent discussions between Robinson and petitioner, and after it had been explained by Robinson to the other managers and to his own corporation's board of directors, was: That Tower Underwriters decided to cease operations as a small-loan "broker"; that in order to completely separate itself from such business so as to avoid difficulties with Mississippi law, it "sold" all of its "brokerage" offices to the respective managers thereof for long-term promissory notes of such managers, which were made payable in monthly installments running to the year 1959, without current interest; and that it thereafter operated solely in the capacity of a lender of funds, and as a guarantor for borrowers' obligations, for the benefit of the purchasing managers. Through the operation of such scheme, Tower Underwriters thus received in 1949 from the sales of its brokerage offices, approximately $120,000 *246 face value of promissory notes of the purchasing office managers. It then entered these notes on its books of account and financial statements, as long-term assets; reported its gains from the transactions on its income tax return, as long-term capital gains from sales of the brokerage office businesses; and used the managers' notes as a means for obtaining approximately $100,000 of lendable funds, which it made available to the managers for their continued operations of the offices and businesses which they had purchased. Shortly thereafter, Tower Underwriters further used these notes as corporate assets, by transferring them to several new Louisiana lending corporations which it organized, in exchange for their shares of capital stock; and one of these new corporations, known as Consumers Credit Corporation of Bogalusa, Louisiana, thereafter acted as petitioner's principal "lender." All these facts are persuasive that the intention of Tower Underwriters, as originator and principal party to the transactions here involved, was to acquire the managers' promissory notes (including those of petitioner) as the consideration for "sale" of its brokerage office businesses, in closed sales *247 transactions of the years in which such notes were delivered. It is significant also, that petitioner stated repeatedly in his testimony and on brief, that the offices were "sold" by the corporation, and were "purchased" by the managers; and that such sales were essential, not only to make financially possible the continued operation of both Tower Underwriters and the brokerage offices, but also to effect legal separation of the businesses of itself and the "brokers" in order to avoid difficulties with the usury laws and privilege taxes of the State of Mississippi. As regards the two promissory notes of petitioner, which he delivered to Tower Underwriters in connection with his acquisition of the two brokerage offices in Jackson, these notes and also the agreements typewritten on the backs thereof, further indicate that the notes were delivered as the purchase price for such offices as going concerns. For example, petitioner's installment note of June 1, 1949, states that "for value received," petitioner promised to pay the amount thereof, in specified installments; and that, in the event of default of any installment, the holder could on its election declare the whole amount due, *248 and employ an attorney to effect collection at petitioner's expense. Also, the related agreement typewritten on the back of the note, further provided in part: "It is mutually agreed between the SELLER AND BUYER as follows: "1. This note constitutes the full purchase price for the brokerage business now being operated as TOWER LOAN BROKERS, in Jackson, Miss. including all rights now vested in SELLER. "2. Effective date of transfer is June 1, 1949; on and after that date seller shall bear no further expense incident to the office sold. * * * "3. * * * The Buyer may sell his equity at any time, provided the Seller has no reasonable objection to the sale." Other provisions of said agreement, which have been quoted in full in our Findings of Fact, provided for the continued operation of the business by the "buyer"; for the carrying by the "buyer" of a one per cent reserve on customers' notes handled by the "lender"; for the "seller's" continuation as secondary guarantor of such customers' notes; and for the "seller's" right to repossess the business, to cancel petitioner's obligation, and to treat all of petitioner's previous payments on the note as "rental," if he ceased to *249 function as a broker or endangered the "seller's equity." Likewise, petitioner's second promissory note of August 1, 1951, which he delivered to Tower Underwriters in connection with his acquisition of the South President Street brokerage office, contained similar provisions; and the agreement on the back thereof, stated: "This note is executed by E. M. Clark, Jr., in consideration of the balance due Tower Underwriters, Inc., for the business known as Dollar Brokers in Jackson, Miss.
"The terms, and condition, governing the purchase of Tower Loan Brokers in Jackson by Clark, likewise govern the purchase of Dollar Brokers and the payment of this note. "This being mutually understood by all parties." These express provisions of the instruments, executed by other parties at the times when the brokerage offices were transferred, must, in our opinion, be given greater weight in determining the intent of the parties, than the contentions and conclusions which petitioner, as only one of the parties to the transactions, presented at the trial several years thereafter, without substantiation by any documentary evidence of record. See Paulsen Spence v. United States, - Fed. Supp. - *250 (Ct. Cls., Dec. 4, 1957). We regard it to be significant that neither of the above-mentioned instruments contains any statement to the effect that the installment payments were to constitute consideration for future services to be rendered by the selling corporation; and that the instruments do provide that, in the event of repossession of the brokerage offices by the seller, such installment payments were to be treated as "rental" for the properties, rather than as payment for services. Both petitioner and Robinson were astute and able businessmen, who were fully acquainted with the brokerage offices and their methods of operation, and who were experienced in drafting installment notes and contracts which expressly defined the considerations therefor and the relationships of the parties. It may reasonably be assumed that, if they had intended the instruments here involved to serve as contracts for future services, they would have so provided. It is particularly important that petitioner, under the terms of the agreements, was to acquire a transferable "equity" in the properties. Both this Court and others have held frequently, that where, pursuant to an installment contract, a *251 taxpayer acquires not only possession and use of property involved, but also an "equity" therein, the installment payments (even though they be designated by the parties as "rents" or "royalties") are to be regarded as the purchase price of the property, and not as deductible business expenses, for income tax purposes. , affirmed (C.A. 9); ; ; . Petitioner has contended, in his testimony and briefs, that the fair market values of the brokerage businesses which he acquired would, if he had no arrangement for a "lender," be less than the principal amounts of his promissory notes here involved; and that, in the absence of the "guarantor" arrangements and "reserve" requirements mentioned in said notes, it would have been necessary for him to either incur expenses for obtaining a guarantor, or to have deposited larger reserves with lenders than the one per cent reserve provided for in the agreements on the back of his notes. But petitioner and Tower Underwriters were under *252 no obligation to price the offices at the fair market values which might have existed under other circumstances; and they were free to make such mutually agreeable arrangements, respecting guarantor's fees and reserve deposits, as they desired. The indications are that Tower Underwriters had a motive for providing favorable terms to petitioner, as an inducement for his purchase of the offices - for both it and its subsidiary, Consumers Credit Corporation, thereby were enabled to place loans through an experienced and trusted "broker" who was capable of selecting borrowers that were good risks; to have petitioner, as such broker, handle the collection, without charge, of approximately $90,000 outstanding loans which Tower Underwriters had previously guaranteed; and to make arrangements under which the petitioner did not receive his brokerage fees until the borrowers' loans had been repaid, thereby procuring additional security for themselves through petitioner's share in the success of collections. Where, as here, written agreements for the purchase of properties have been mutually entered into by competent and experienced parties, it is not for this Court to revise such agreements *253 into contracts for services, to be performed in the future under undefined terms and conditions. We hold that the installment payments made by petitioner in the taxable year, pursuant to the terms of his two promissory notes here involved, are not deductible by him as business expenses of said years, within the meaning of section 23(a)(1)(A) of the 1939 Code. Decision will be entered under Rule 50. Footnotes
1. Extended representations respecting the origin, the purpose, and the method of operation of such "brokerage" offices were made by petitioner in his testimony, in his briefs, and in the opening statements at the trial. See also statements of the Supreme Court of Mississippi regarding loan "brokerage" offices, in . ↩
2. Sections 36 and 37, Mississippi Code of 1942, Annotated, as amended.↩
3. Section 23(a)(1)(A) of the 1939 Code provides, in part, that in computing net income there shall be allowed as deductions: "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *."↩